STATE OF CONNECTICUT *v.* KEITH JOHNSON
(AC 23479)

Dranginis, West and Stoughton, Js.

Argued April 2—officially released June 8, 2004

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John F. Fahey*, senior assistant state's attorney, for the appellee (state).

*Opinion*

STOUGHTON, J. After a conviction by the jury on all seven counts of an information and sentencing, the defendant, Keith Johnson, filed the present appeal. The defendant's sole claim is that the court abused its discretion by restricting his cross-examination of one of the state's witnesses. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Both the defendant and Christopher Booth had

once been employed at the Chuck E. Cheese restaurant (restaurant) in Manchester. They discussed a plan to steal money from the restaurant after it had closed for the day, but decided against that plan because the defendant said there was only a fifty-fifty chance that there would be money in the cash registers. Instead, they planned to enter the restaurant at a time when only the manager and one other employee were present, and they chose Sunday, August 27, 2000, as the date. The defendant cut the sleeves from a sweatshirt to fashion masks, and he carried a pellet gun, having been persuaded by Booth not to carry what Booth called a "real firearm." Booth drove the two of them to a parking lot near the restaurant where they waited until only the manager and one other employee were left inside. Wearing their masks, they went to the back door, but before they could try to enter, Oscar LeBron, an employee, came out carrying a bag of garbage. LeBron saw the two and tried to get back inside, but the door had closed and locked. The defendant pointed the pellet gun at LeBron and ordered him to get on the ground. LeBron, who spoke Spanish, did not seem to understand and struggled for the gun. The gun fell and Booth handed it back to the defendant, who struck LeBron on the head with it, causing contusions and lacerations about the face and head, for which LeBron later received medical treatment at Hartford Hospital.[1] LeBron managed to escape, and Booth and the defendant fled from the scene in Booth's car. The defendant subsequently confessed to his girlfriend, Cassandra Cyr, that he and Booth had gone to the restaurant that night planning to commit the robbery and described in detail what had occurred. Cyr told the police what the defendant had told her, and the defendant was arrested.

Prior to the start of the trial, the court granted the state's motion in limine to prohibit the defendant from

---

[1] LeBron was unable to identify either Booth or the defendant.

introducing, offering, referring to or mentioning evidence that the crimes charged were committed by anyone other than the defendant until the court had been able to rule on the admissibility of any such evidence. During the trial, the state called Booth as a witness. Booth, who had been named in the information as a coconspirator with the defendant, described the crimes. Booth testified that after planning the robbery, he and the defendant had left the place where they were then residing to go to the restaurant. The following examination then occurred:

"Q. Where were you living at the time?

"A. I was living in Storrs.

"Q. Was anyone with you and [the defendant]?

"A. When we left, no. At my apartment, I believe one of my roommates was there and a friend of his.

"Q. When you left for the [restaurant], who went?

"A. Me and John—I mean me and Keith Johnson."

Thereafter, during cross-examination of Booth, the following colloquy occurred:

"Q. But when [the prosecutor] asked you who you went to do the robbery with when you were driving there on the night of August 27, you said me and John?"

"A. Johnson.

"Q. Ja, Ja, then you said, me and Keith Johnson, right?"

The prosecutor interposed an objection, claiming that the question was argumentative, and that it mischaracterized the testimony and violated the motion in limine that had been granted. The court excused the jury and proceeded to hear extensive argument during which the prosecutor advanced the position that the defendant

was attempting to implicate a third party in the commission of the crime through a misstatement by Booth.[2] In response to an inquiry from the court as to why the question did not implicate the third party culpability issues, the defendant responded that Booth had testified that he and John had gone to commit the robbery and that he was entitled, pursuant to the sixth amendment and corresponding provisions of the Connecticut constitution, to confront and cross-examine Booth about his testimony. Ultimately, the court ruled that either directly or indirectly, the defendant had attempted to bring in third party culpability of someone named John without any direct connection between a third party and the crime, and sustained the state's objection.

After the jury returned, the court made the following ruling: "But in any event, when you were last in the court, [defense counsel] had asked a question. There was an objection. I sustained the objection, and any answer that was given is now ordered stricken and should be disregarded." Precisely what the jury was instructed to disregard is not entirely clear, as Booth never responded to the last statement made by defense counsel prior to the state's objection.

Subsequently, the court, during a charging conference, explained that although defense counsel would not be able to argue third party culpability, he would be able to make whatever argument he wanted to make with respect to Booth's hesitant response during direct examination by the state. Defense counsel in fact reminded the jury during his closing argument that Booth had said, when asked with whom he went on the night of the robbery: "John, ah, ah, John, ah, ah, Johnson. Not Keith."

---

[2] During argument outside the presence of the jury, the court listened to the tape of the relevant portion of Booth's testimony.

On appeal, the defendant claims that the court abused its discretion and violated his right of confrontation as guaranteed by the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution by curtailing his cross-examination of Booth.[3] The state responds by arguing that evidence of third party culpability was irrelevant because any connection between a third party and the crimes charged was lacking. We need not decide whether the court abused its discretion in limiting the cross-exami-

---

[3] "The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant *must* be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . . The defendant's right to cross-examine a witness, however, is not absolute. *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985) ([e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error). Therefore, a claim that the trial court unduly restricted cross-examination generally involves a two-pronged analysis: whether the aforementioned constitutional standard has been met, and, if so, whether the court nonetheless abused its discretion . . . in which case, in order to prevail on appeal, the defendant must show that the restrictions imposed upon the cross-examination were clearly prejudicial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Clark*, 260 Conn. 813, 826–27, 801 A.2d 718 (2002).

In the present case, the defendant has not claimed that his sixth amendment right to cross-examination has been denied. Instead, he argues that the court abused its discretion by improperly curtailing his cross-examination and, thus, he raises an evidentiary rather than a constitutional challenge.

In his brief to this court, the defendant mentioned his federal and state constitutional rights to cross-examine the witnesses against him. He then focused his argument, however, solely as an evidentiary rather than a constitutional issue. He indicated that the applicable standard of review is the abuse of discretion standard and claimed that the court abused its discretion by improperly applying *"the evidentiary rule* limiting the introduction of third party culpability evidence by a defendant." (Emphasis added.)

nation by its ruling on the state's third party culpability objection because even if we assume that this ruling was improper, it was harmless.

Because the alleged trial court impropriety is not constitutional in nature, on appeal, the defendant has the burden to establish harm flowing from that error to obtain a reversal of the judgment. "Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result. . . . Furthermore, [t]he ruling of the trial court in order to constitute reversible error must have been both incorrect and harmful. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 653–54, 789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002).

First, Cyr, the defendant's girlfriend, testified that the defendant told her that he and Booth had planned and attempted to rob the restaurant, but were unsuccessful.[4] She also stated that the defendant had informed her that both he and Booth had assaulted LeBron. Second, Booth, when asked who went with him, said, "Me and

[4] During direct examination of Cyr, the following colloquy occurred:

"Q. Did you have a conversation with [the defendant] at that time related to the incident which had occurred in late August or early September at [the restaurant]?

"A. Yes.

"Q. And could you tell me what [the defendant] told you?

"A. [The defendant] told me that they had planned on robbing the [restaurant]. They didn't intend on hurting anybody.

"Q. When you say 'they,' who do you mean?

"A. Him and [Booth]."

John," then immediately corrected his answer to identify the defendant by stating, "Keith Johnson." It seems clear from the entire context that he meant to say "Johnson," but then changed in the middle of the word to say "Keith Johnson." Third, Booth consistently testified that his sole partner in the criminal endeavor, from the planning through the unsuccessful commission of the crime, was the defendant. Finally, the court permitted counsel for the defendant to argue Booth's misstatement to the jury.[5] In short, even if we assume that the court's ruling was improper, in light of those other facts and circumstances, it is clear that any such error was harmless. The defendant has failed to establish that the court's ruling affected the result of the trial or undermined confidence in the fairness of the verdict. See *State* v. *Gombert*, 80 Conn. App. 477, 489–90, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004). Accordingly, his claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] During closing argument, defense counsel stated: "Want to talk about reliability and credibility. [The prosecutor] asked Mr. Booth: Who were you with the night of August 27? Christopher Booth said me, Keith and a couple of other guys at the house. Just like he said Keith or Keith Johnson during his entire testimony. [The prosecutor] then said: *Who did you go with on the night of August 27 to do the robbery? And you all heard what he said: John, ah, ah, John, ah, ah, Johnson. Not Keith. It's not what he said. You heard what he said.*" (Emphasis added.)