STATE OF CONNECTICUT *v.* SCOTT JACOBSON
(AC 23983)

Bishop, West and Dupont, Js.

Argued October 22, 2004—officially released February 15, 2005

*David B. Bachman,* for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Cornelius P. Kelly,* senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Scott Jacobson, appeals from the judgments of conviction, rendered following a trial to the jury, of nine counts of sexual misconduct

involving two victims.[1] As to the first victim, M, the defendant was convicted of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2). As to the second victim, B, the defendant was convicted of one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A) and three counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2). The court sentenced the defendant to a total effective term of twenty years imprisonment, execution suspended after fifteen years, with twenty years probation.

On appeal, the defendant claims that (1) the court improperly admitted into evidence (a) fifty-nine photographs, (b) testimony regarding a ziplock bag of hair and (c) testimony concerning alleged prior misconduct committed by the defendant, (2) the state engaged in prosecutorial misconduct as a result of comments made by the prosecutor during closing argument, and (3) the court violated his right to due process of law by instructing the jury that it would "not require specific times, dates and places that will render prosecution of those who sexually abuse children impossible." We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In 1995, as coach of a youth ice hockey team, the defendant met seven year old B, whose older brother was a member of the team, and B's mother. The defendant befriended B's mother, who was having marital

[1] In accordance with General Statutes § 54-86c and this court's policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained.

difficulties at the time, offering to drive her son to Greenwich for hockey practices and games. She welcomed the help and even let B, who was not a team member, tag along for the rides. During that time, the defendant expressed a special interest in B, encouraging him to play hockey, helping him with his schoolwork and letting him sleep at his home a few nights a week. They became so close that the defendant became B's godfather.

Sometime later, the defendant registered B to play on a youth football team. It was there that the defendant met nine year old M, one of B's teammates, and M's mother, a divorcee. M saw the defendant about twice a week during the football season and once a week after the football season ended, and occasionally he stayed the night at the defendant's home, along with B. At the request of M's mother, the defendant helped M with his schoolwork and became, according to M's mother, part of her support system.

In 1999, the defendant moved to Florida, but he maintained contact with both M and B. He purchased a cell phone for M and called him regularly for updates on his schoolwork. He checked on B a couple of times a week to find out how he was faring in school and with sports. He also returned periodically to Connecticut to visit them both.

On one such visit, in 2001, the defendant stayed two nights at B's house, along with M. The defendant slept in the same bedroom as M, B and two of B's brothers. The beds were pushed together, and the defendant slept next to M. M testified that he awoke the first night and realized that the defendant was under the covers performing oral sex on him. Rather than confront the defendant, M pretended to be asleep. The next day, M accompanied the defendant and B to breakfast, but decided not to mention what had occurred the night

before. That night, M and the defendant again stayed at B's house, the sleeping arrangements being the same. According to M, he awoke in the night to find the defendant performing oral sex on him. He ejaculated in the defendant's mouth and cried himself to sleep.

Shortly thereafter, M's mother had a falling out with her parents, with whom she and her two sons were living, and was asked to leave. After speaking with the defendant about the falling out, she and her two boys left for Florida and eventually moved into an apartment with the defendant. According to M's mother, she and the defendant initially got along quite well, but as time went on, she became increasingly concerned with his relationship with M, claiming that he spent an inordinate amount of time and money on M. As her relationship with the defendant soured, she asked him to leave the apartment, after which she was told by M that he had been sexually assaulted by the defendant. She immediately contacted the local police and arranged for M to return to Connecticut. Before returning to Connecticut herself, M's mother confronted the defendant with her son's allegation, to which he responded that M was lying.

Back in Connecticut, M informed the Monroe police department that he had been sexually assaulted by the defendant at B's house in March, 2001. The police contacted B's mother, who was on vacation in Florida, and asked her to bring B to the police station when she returned to Connecticut. She flew back the next day, contacted the police department and was told that the defendant allegedly had sexually assaulted M. According to B's mother, she refused to believe the allegation. On the drive to the police station, she expressed to B her frustration with M and his mother, telling B that it was a waste of time to go to the police department. B responded: "I know this happened to [M] because it happened to me, too."

According to B, while he was in the third grade, he was sexually assaulted by the defendant on three occasions. The first incident occurred when he slept at the defendant's home, in the same bed, and awoke to find the defendant touching his penis with his hands and mouth. B said nothing and eventually fell back asleep. The second incident occurred a few weeks after the first incident. B again slept at the defendant's house, and before he fell asleep, the defendant forced B to touch the defendant's penis, after which he asked B to keep it secret. The third incident occurred a few months later, again at the defendant's house. That night, before B fell asleep, the defendant, who was naked, approached B, fondled his penis, giving him an erection, and attempted unsuccessfully to have B sodomize him. Additional facts will be set forth as necessary.

## I

We first address the defendant's evidentiary claims, namely, that the court improperly admitted into evidence (1) fifty-nine photographs, (2) testimony regarding a ziplock bag of hair and (3) testimony concerning alleged prior misconduct committed by the defendant.

"We have a well established standard by which we review claims of an evidentiary nature. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . It is a fundamental rule of appellate procedure in the review of evidential rulings, whether resulting in the admission or exclusion of evidence, that an appellant has the burden of establishing that there

has been an erroneous ruling which was probably harmful to him." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson,* 74 Conn. App. 633, 644–45, 813 A.2d 1039, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003).

A

The defendant claims that the court improperly admitted into evidence fifty-nine photographs. Although we agree with the defendant that the court improperly admitted some of the photographs into evidence, we conclude that the improper admission was harmless.

According to M's mother, after M informed her that he had been sexually assaulted by the defendant, she began packing her things in order to return to Connecticut. In doing so, she came across the defendant's briefcase in a closet next to his bedroom, in which she discovered, among other things, fifty-nine photographs, primarily of young boys, including two of M and four of B. Although the boys in the photographs were not nude, a few were shirtless. The defendant explained that the photographs were, in large part, hockey memorabilia, pictures given to him by parents of hockey players whom he had coached throughout the years.

Outside of the jury's presence, the state offered into evidence all fifty-nine photographs, arguing that "[i]t goes to the interest—the intent, the interest this defendant has in young boys." The court ruled, over the defendant's objection, that all fifty-nine photographs were admissible. Its rationale was that "all of the pictures involved, with the exception . . . of one where there is a young girl there, all of them are young boys. And it's going to show, keeping those pictures, his proclivity or interests in young boys." The court instructed the jury, however, that possession of the photographs

was not criminal and that the jury was free to decide what weight, if any, to give the evidence.

The defendant argues that the admission of the photographs was improper because it allowed evidence and testimony that tended to suggest a criminal propensity, even though the photographs were not in any way connected to the commission of the crimes charged. The state concedes that the court applied an incorrect legal analysis when it admitted the photographs into evidence, but argues that the decision nonetheless was correct, as the photographs were relevant evidence.

"Connecticut Code of Evidence § 4-1 provides in relevant part that [r]elevant evidence means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. As it is used in the code, relevance represents two distinct concepts: Probative value and materiality. . . . Conceptually, relevance addresses whether the evidence makes the existence of a fact material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . [I]t is not necessary that the evidence, by itself, conclusively establish the fact for which it is offered or render the fact more probable than not. . . . In contrast, materiality turns upon what is at *issue* in the case, which generally will be determined by the pleadings and the applicable substantive law . . . . If evidence is relevant and material, then it may be admissible." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Izzo*, 82 Conn. App. 285, 291–92, 843 A.2d 661, cert. denied, 270 Conn. 902, 853 A.2d 521 (2004).

Although the six photographs of the victims certainly did have a "tendency to make the existence of [a] fact that is material to the determination of the proceeding

more probable or less probable than it would be without the evidence"; (internal quotation marks omitted) id., 291; the remaining fifty-three photographs, which depict boys other than the victims, most certainly did not. For example, they did not have any direct connection with the crimes charged; but see *State* v. *Springmann*, 69 Conn. App. 400, 417, 794 A.2d 1071 (pornographic video-tapes shown to minors "were clearly connected to the crime charged because the presentation of the video-tapes was the basis for two counts involving [risk of injury to a child]"), cert. denied, 260 Conn. 934, 802 A.2d 89 (2002); nor were they sexually explicit. Cf. *State* v. *Jenkins*, 7 Conn. App. 653, 654–55, 509 A.2d 1098 (testimony by defendant's wife that she found maga-zines in defendant's room that depicted naked girls about same age as victim "was probative of the fact that the defendant regarded young girls as objects of sexual interest, and was thus relevant to the charges against him"), cert. denied, 201 Conn. 805, 513 A.2d 700 (1986). Accordingly, we conclude that it was improper for the court to admit those photographs into evidence.

"Because the . . . trial court impropriety is not con-stitutional in nature, on appeal, the defendant has the burden to establish harm flowing from that error to obtain a reversal of the judgment. Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper eviden-tiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result. . . . Furthermore, [t]he ruling of the trial court in order to constitute reversible error must have been both incor-rect and harmful. . . . The question is whether the trial court's error was so prejudicial as to deprive the defen-dant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the

result." (Internal quotation marks omitted.) *State* v. *Johnson*, 83 Conn. App. 319, 325, 848 A.2d 1271 (2004).

Despite the defendant's argument that the other fifty-three photographs served only to suggest that he had strange sexual proclivities, they may have, in fact, served his interests. Without those photographs, the jury would have been left with the impression that the defendant possessed photographs only of the two victims. The additional photographs allowed the jury to infer that the six photographs of the victims held no special significance to the defendant. Accordingly, we conclude that the defendant has failed to satisfy his burden of establishing that the impropriety was harmful in that it likely affected the result of the trial.

B

The defendant next claims that the court improperly admitted into evidence testimony concerning a ziplock bag of hair. Although we agree with the defendant that the court's evidentiary ruling was improper, we conclude that the impropriety was harmless.

At trial, the state offered into evidence a ziplock bag of hair that M's mother allegedly discovered, along with the photographs, in the defendant's briefcase. The court precluded the state from introducing the bag of hair into evidence on the ground that it could lead to speculation by the jury. Later, however, the state notified the court that it intended to question the defendant about the bag of hair on cross-examination. The court ruled, over the defendant's objection, that the state would be allowed to do so. When questioned about the hair, the defendant explained: "[T]he captain of my . . . team shaved his head before a tournament. His mother put the hair in a . . . manila envelope with a little certificate they made on a computer, and a letter from his mother explaining [that] this is official [team] hair."

The defendant argues that the state offered no theory of relevance when it disclosed its intent to question him about the bag of hair. Further, he argues, the court did not know from whom the hair originated, nor did it explain its ruling, particularly how the bag of hair had become less likely to encourage speculation by the jury since the court's original decision to preclude the state from introducing the bag of hair into evidence.[2] The state responds that the bag of hair was relevant as to the circumstances under which it was found.

The testimony concerning the ziplock bag of hair suffers the same frailty as the improperly admitted photographs, that is, it did not make "the existence of a fact that is material to an issue in the case more or less probable, even to a slight degree . . . ." *State* v. *Fisher*, 82 Conn. App. 412, 431, 844 A.2d 903, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). Nevertheless, the evidence was presented in passing, and neither the prosecutor nor defense counsel focused their examinations on that evidence. See *State* v. *Gombert*, 80 Conn. App. 477, 490, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004). Further, the prosecutor did not emphasize or rely on the testimony during closing argument. Indeed, he mentioned the challenged testimony only briefly in his rebuttal closing argument. Moreover, apart from the challenged testimony, there was ample evidence to support the defendant's conviction. In short, we conclude that the defendant has failed to carry his burden of establishing that the evidentiary impropriety was harmful.

## C

In his final evidentiary claim, the defendant asserts that the court improperly admitted into evidence testimony regarding alleged prior misconduct committed

[2] The bag was marked for identification, but was not admitted into evidence as an exhibit.

by the defendant. Although we agree with the defendant that the challenged testimony was admitted improperly, we conclude that its admission was harmless.

In its rebuttal case, the state offered K's testimony as prior misconduct evidence. She testified that she met the defendant sometime in 1990 or 1991, when she was going through a difficult divorce. She introduced the defendant to her son, who was seven or eight years old at the time, and the two quickly became friends. The defendant suggested that her son take up ice hockey, but K informed him that she had neither the time nor the money for him to do so. The defendant offered to pay for her son's hockey expenses and to drive him to and from practices and games. K accepted the offer. On one occasion, when her son had a game on Friday night and another early Saturday morning, the defendant had him sleep at his house. One week later, K learned that her son had slept in the same bed with the defendant. Shortly thereafter, she decided to end the defendant's relationship with her son. She testified in relevant part: "I started pulling back and pulling away because . . . my eyes were opened to what vulnerability I would be in with my divorce, and I didn't think it was a good situation, and I didn't think it was good judgment call on [the defendant's] part."

According to the defendant, the state offered K's testimony supposedly to rebut his allegation that he was forced into a surrogate father role with the two victims and to suggest that as part of a pattern of behavior, he sought out this type of relationship. The defendant asserts that if the testimony was offered simply for that purpose, there was no need to introduce the fact that K's son had slept in the same bed with the defendant. Thus, he argues in his brief that "[t]he only reason to include that incident was to suggest to the jury that if the relationship had continued, [the defendant] was likely to have sexually assaulted [K's son] as well."

The state counters that similarities in the method the defendant used to gain the young boys' trust demonstrated a common scheme.

"The standard of review is clear. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . .

"One exception to the general rule barring evidence of uncharged misconduct is that such evidence is admissible if it is offered to prove a common plan or scheme. . . . To be admissible under the common scheme exception, the marks which the uncharged and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . To guide that analysis, [our Supreme Court has] held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to

show a common design or plan where the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Aggen*, 79 Conn. App. 263, 270–72, 829 A.2d 919 (2003).

Here, the uncharged misconduct satisfies the first and third factors, but fails to satisfy the second factor, because it does not share features similar to the charged offenses sufficient to infer that the uncharged misconduct and the charged offenses were manifestations of a common scheme. Although the defendant's relationship with K's son bore many similarities to his relationship with M and B—namely, the mothers of all three boys were divorced, the defendant befriended each boy's mother, the defendant helped each boy, bought each boy gifts and had each boy sleep at his home—there was a crucial difference: The defendant did not sexually abuse K's son. That said, it cannot be inferred logically that if the defendant was guilty of the uncharged misconduct, he also must have been guilty of the charged offenses involving M and B. See id., 271. Accordingly, we conclude that the court improperly admitted into evidence K's testimony regarding uncharged misconduct committed by the defendant.

"Although we conclude that the trial court improperly [admitted into evidence the challenged testimony], we also must determine whether the trial court's decision was harmful. In a case involving an evidentiary ruling, it is the defendant's burden to show that it is more probable than not that the court's action affected the result. . . . Some degree of prejudice inevitably accompanies the admission of evidence of a defendant's other misconduct." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 365, 852 A.2d 676 (2004).

To demonstrate why the prior misconduct evidence in the present case was harmless, we compare it to that

in a case in which it was deemed harmful. In *Ellis,* our Supreme Court concluded that the trial court improperly denied the defendant's motion to exclude evidence of an alleged scheme to sexually abuse girls he met through his position as a softball coach because "a comparison of the defendant's initial abuse of [the victim] and his abuse of the [three] other girls reveal[ed] insufficient similarities to weigh in favor of admitting the prior misconduct evidence in the case involving [the victim]." Id. The Supreme Court determined that the inclusion of the evidence was harmful: "[T]he testimony of [the three other girls] was potentially prejudicial to the defendant in [the victim's] case and we cannot conclude that it was harmless. Any improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless. . . . That the defendant's abuse of the other girls was not as severe as his abuse of [the victim] does not mean that the evidence of such abuse was harmless. *The sheer quantity of testimony concerning the defendant's abuse of the other girls was likely to have been harmful in its cumulative effect upon the jury's deliberations.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 367–68.

The prior misconduct evidence in the present case is distinguishable from that in *Ellis* in two key respects: It lacked not only the "sheer quantity" of testimony in *Ellis,* but also any allegation of abuse. K was the sole witness to testify as to the defendant's alleged prior misconduct, and she never alleged that the defendant abused her son. That said, we cannot conclude, as did our Supreme Court in *Ellis,* that the testimony of prior misconduct had "a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury . . . ." (Internal quotation marks omitted.) Id.

We conclude that the admission of the testimony concerning prior misconduct was harmless.

## II

The defendant next claims that the state engaged in prosecutorial misconduct as a result of three comments made by the prosecutor during closing argument. Specifically, he argues that the prosecutor denied him his right to a fair trial by alluding to matters outside the record and by appealing to the jury's emotions. The state responds that the challenged statements do not constitute prosecutorial misconduct and, alternatively, that even if the comments were improper, they were not so prejudicial as to deprive the defendant of his right to a fair trial. We conclude that the prosecutor's comments were not improper and, thus, reject the defendant's claim.

Initially, we note that the defendant did not preserve two of his claims of prosecutorial misconduct at trial.[3] "Nonetheless, we will review [them], as we do preserved claims of misconduct.[4] See *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004) (analyzing unpreserved prosecutorial misconduct claim as if preserved for appellate review). In so doing, we undertake a two-pronged inquiry. . . . First, we determine

[3] The defendant requests that we review his unpreserved claims under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); the plain error doctrine; Practice Book § 60-5; and this court's supervisory powers. See Practice Book § 60-2. It is no longer necessary to review unpreserved claims of prosecutorial misconduct pursuant to *Golding*. See *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004).

[4] "That does not mean, however, that the absence of an objection at trial does not play a significant role in our analysis of the defendant's claim. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]." (Internal quotation marks omitted.) *State* v. *Ritrovato*, 85 Conn. App. 575, 591 n.20, 858 A.2d 296, cert. granted on other grounds, 272 Conn. 905, 863 A.2d 699 (2004).

whether the challenged conduct was improper. . . . If we answer that question in the affirmative, we then assess whether that misconduct, when viewed in light of the entire trial, deprived the defendant of his due process right to a fair trial." (Citations omitted.) *State* v. *Ritrovato*, 85 Conn. App. 575, 591, 858 A.2d 296, cert. granted on other grounds, 272 Conn. 905, 863 A.2d 699 (2004).

Before undertaking that inquiry, we note "that because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Nevertheless, [w]hile a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Tate,* 85 Conn. App. 365, 370–71, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004).

With that in mind, we address the three instances of alleged prosecutorial misconduct. The first comment challenged by the defendant was: "I don't mean to suggest to you that that's the only information. That's the only information the young boys gave to the witnesses. But by law and the evidence allowed to be presented to you, the state is limited in only those certain facts." According to the defendant, in making the comment, the prosecutor suggested to the jury that the state possessed additional evidence against him, but that the law prevented its admission. We disagree with the defendant.

During closing argument, the prosecutor discussed the testimony of the constancy of accusation witnesses, stating: "The victim's testimony is corroborated by some of the witnesses who testified here. The judge is going to tell you about a term called 'constancy of accusation.' And, basically, the state is limited in gathering information from these witnesses as to the who, what, when and where." He continued: "Some of the witnesses, the mom, [a police] detective . . . the grandmother . . . can only testify as to limited issues here in terms of what was said to them. They can only say the general nature of what was said to them, where it occurred and who was responsible." At that point, the prosecutor made the allegedly inappropriate comment: "I don't mean to suggest to you that that's the only information. That's the only information the young boys gave to the witnesses. But by law and the evidence allowed to be presented to you, the state is limited in only those certain facts."

When read in isolation, the prosecutor's allegedly improper comment might constitute what the defendant describes in his brief as "an invitation to imagination: Who knows what those complicated legal rules might conceal?" When read in context, the comment merely explains the limitations of constancy of accusation testimony, namely, that "[t]estimony is to be restricted to such facts as the identity of the alleged perpetrator and the timing of the victim's complaint, details to be limited to those necessary to associate the victim's complaint with the pending charge . . . ." (Internal quotation marks omitted.) *State* v. *Samuels*, 75 Conn. App. 671, 676, 817 A.2d 719, cert. granted on other grounds, 263 Conn. 923, 823 A.2d 1216 (2003). Thus, we conclude that the prosecutor's comment was not improper.

The second comment challenged by the defendant involves the ziplock bag of hair that M's mother allegedly discovered in his briefcase. The prosecutor stated

that the defendant "kind of knew there was going to be an issue. Yet, he can't remember the last name of this young boy whose hair it was, that you had in your possession and considered hockey memorabilia." The defendant argues that the state's comment implied that he was not a believable person and raised suspicions as to his private conduct.

The state counters that the comment, when read in context, was based entirely on evidence produced at trial. It cites the following language from the rebuttal closing argument: "There was testimony about the hair, that it came from somebody that cut their hair at a hockey tournament. And the defendant, I think he said the kid's name . . . . And I asked questions about, 'Well, you knew this was part of the case. You knew that [M's mother] had taken some items from your apartment, the pictures and the hair.' And not that this is evidence of anything, the fact [that] he was arrested at some point in time, the defendant, he kind of knew there was going to be an issue. Yet, he can't remember the last name of this young boy whose hair it was, that you had in your possession and considered hockey memorabilia."

In essence, the challenged statement is no more than an attack on the defendant's credibility as a witness. "While a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Dupigney*, 78 Conn. App. 111, 124, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003). In commenting on evidence adduced at trial, "[t]he prosecutor merely asked the jury to draw a reasonable inference from the evidence that the defendant's power of recall was conveniently limited . . . ."

Id., 124–25. Accordingly, we conclude that the prosecutor's comment was not improper.

Finally, the defendant challenges the following comment by the prosecutor as an appeal to the jury's emotions: "And if you, as a juror, do not hold the defendant responsible for what he has done, no one ever will." "It is well settled that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Tate*, supra, 85 Conn. App. 372–73. The defendant argues that the prosecutor did just that, diverting the jury's attention from its fact-finding function and encouraging it to decide the case on the basis of its emotional reaction to sexual abuse of a child. We disagree.

In support of his argument, the defendant asserts that other decisions have deemed similar comments improper. He first cites *State* v. *Mills*, 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000). In that case, during his closing argument, the prosecutor stated: "It's murder, murder based on an unprovoked attack of a man sitting at a table, minding his business. *If we allow this to happen, we are all in trouble. If—we could be in somebody's house and somebody—minding our business, somebody can come in and stab . . . .*" (Emphasis added; internal quotation marks omitted.) Id., 207 n.8. In concluding that the prosecutor's remark was improper, we stated that the prosecutor's "opinion that society would be in trouble if the defendant were not convicted might . . . have played a part in the jury's decision to convict because of a fear that the defendant might strike again if acquitted." Id., 209.

The defendant also cites *State* v. *Gold*, 180 Conn. 619, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). In that case, the state's attorney finished his closing argument as follows: "Now, when [the defense attorney] says to you you'll wake up screaming if you return the verdict of guilty, I say to you you'll wake up screaming if you return a verdict of not guilty, because to do good to the bad, the spirit of the bad, is to do evil to the good and *make you responsible, you, yes, you, for all the acts this man may subsequently commit, because you let him go free.*" (Emphasis added; internal quotation marks omitted.) Id., 658. Our Supreme Court concluded that "[t]he state's attorney improperly argued the necessity of preventing further injury to society by the defendant himself. A defendant is on trial for what has been done and not for what he or she might do. . . . Also, by threatening that a verdict of not guilty would make 'you responsible, you, yes, you, for all the acts this man may subsequently commit, because you let him go free,' the state's attorney even further diverted the jury from its duty to decide the case solely on the evidence." (Citations omitted.) Id., 659.

*Mills* and *Gold* are readily distinguishable from the present case. The improper comments in those cases focused not on the defendants' past conduct, but on their future conduct, and a "prosecutor [may not] imply to the jury that a not guilty verdict will make it responsible for the defendant's future conduct." *State* v. *Williams*, 204 Conn. 523, 548, 529 A.2d 653 (1987) (prosecutor engaged in misconduct by "repeatedly [making] comments during closing argument beseeching the jury to protect the victim and other children from the future conduct of the defendant"). Here, the alleged improper comment—"And if you, as a juror, do not hold the defendant responsible for what he has done, no one ever will"—does not address future con-

duct, but rather, it addresses the criminal conduct at issue in the case.

That said, this case is more akin to *State* v. *Jenkins*, 70 Conn. App. 515, 800 A.2d 1200, cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002). In *Jenkins*, during rebuttal argument, the prosecutor stated: "Where is justice in our society? Maybe when you heard that the police arrested this defendant you thought they were responsible for justice, and maybe when you heard that the information filed against him, which is in evidence, had my name on it, you thought maybe the prosecutor is responsible for justice, and as you watched Judge Hartmere presiding over this case, even managing the evidence, you thought that maybe the judge is responsible for justice, but none of that is entirely true. In the United States of America you, the jury, the citizens, are justice, and *in this trial you are justice, and the decision you make will be the only opportunity to bring justice in this case to Marcus Warner and the other victims, at least on this earth* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 538–39. Distinguishing *Mills*, we concluded that the prosecutor's comments were not improper and that they did not infringe on the defendant's right to a fair trial. Id., 539.

Here, the prosecutor's comment was similar to, and much less dramatic than, the remarks in *Jenkins*. In light of that case, we cannot conclude that the prosecutor's comment was improper.

### III

In his final claim, the defendant asserts that the court violated his right to due process of law when it instructed the jury that it would "not require specific times, dates and places that will render prosecution of those who sexually abuse children impossible." That instruction, he argues, diluted the state's burden to

prove his guilt beyond a reasonable doubt. We are not persuaded.

"We note that the standard of review for a claim of an improper jury instruction is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Morales*, 84 Conn. App. 283, 295–96, 853 A.2d 532, cert. denied, 271 Conn. 928, 859 A.2d 584 (2004).

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged. . . . It is axiomatic that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction." (Internal quotation marks omitted.) *State* v. *Turner*, 67 Conn. App. 519, 523, 787 A.2d 625 (2002); see also *State* v. *Gonzalez*, 205 Conn. 673, 694, 535 A.2d 345 (1987) (*Callahan, J.*, concurring) ("state's burden of proof beyond a reasonable doubt *applies only to the essential element or elements of a crime*" [emphasis added]). A jury instruction that effectively relieves the state of its burden to prove an essential element of the crime charged implicates the defendant's right to due process. *State* v. *Theriault*, 182 Conn. 366, 378–79, 438 A.2d 432 (1980);

*State* v. *Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

We conclude that the jury instruction at issue in this case—that the court would "not require specific times, dates and places that will render prosecution of those who sexually abuse children impossible"—did not relieve the state of its burden to prove an essential element of the crime charged, as "[i]t is a well-established rule in this state that *it is not essential in a criminal prosecution that the crime be proved to have been committed on the precise date alleged,* it being competent ordinarily for the prosecution to prove the commission of the crime charged at any time prior to the date of the complaint and within the period fixed by the statute of limitations." (Emphasis added; internal quotation marks omitted.) *State* v. *Morrill*, 197 Conn. 507, 552, 498 A.2d 76 (1985). As such, the defendant's claim must fail.

The judgments are affirmed.

In this opinion the other judges concurred.