STATE OF CONNECTICUT *v.* SCOTT JACOBSON
(SC 17415)

Borden, Norcott, Katz, Palmer and Zarella, Js.*

---

*The listing of justices reflects their seniority status as of the date of oral argument.

Argued May 16, 2006—officially released August 21, 2007

*Norm Pattis,* for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Cornelius P. Kelly,* senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Scott Jacobson, guilty of nine counts of sexual misconduct involving two young male victims.[1] As to the first victim, M, the jury found the defendant guilty of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2)[2] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 2001)

---

[1] In accordance with General Statutes § 54-86e and this court's policy of protecting the privacy interests of victims of sexual abuse, we do not identify the victims or others through whom the victims' identities may be ascertained.

[2] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

§ 53-21 (a) (2).[3] As to the second victim, B, the jury found the defendant guilty of one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-70 (a) (2) and 53a-49 (a) (2),[4] one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A),[5] and three counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2).[6] The trial court rendered judgments in accordance with the jury verdicts,[7] from which the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court had abused its discretion in allowing the state to introduce into evidence (1) testimony concerning the defendant's alleged prior misconduct involving a third young male, (2) certain photographs of young children that had been found in the defendant's possession, and (3) testimony regarding a ziplock bag of hair that also had been found in the defendant's possession. See *State* v. *Jacobson*, 87 Conn. App. 440, 443, 866 A.2d 678 (2005).

---

[3] General Statutes (Rev. to 2001) § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

[4] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[5] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[6] We note that the language of General Statutes (Rev. to 1997) § 53-21 (2) is identical in all material respects to the language of General Statutes (Rev. to 2001) § 53-21 (a) (2), which is quoted in footnote 3 of this opinion.

[7] The trial court sentenced the defendant to a total effective term of imprisonment of twenty years, execution suspended after fifteen years, and twenty years probation.

Although the Appellate Court agreed with each of the defendant's claims of evidentiary impropriety; id., 449, 451, 454; it also concluded that those improprieties were harmless and, therefore, that the defendant was not entitled to a new trial.[8] See id., 450, 451, 456. We granted the defendant's petition for certification to appeal limited to the following issues: "Did the Appellate Court properly determine that the improper introduction of fifty-three photographs, testimony regarding a ziplock bag of hair and testimony regarding the defendant's prior misconduct constituted harmless error?" *State* v. *Jacobson,* 273 Conn. 928, 873 A.2d 999 (2005). With respect to the testimony concerning the defendant's prior misconduct, we conclude that, contrary to the determination of the Appellate Court, the trial court did not abuse its discretion in allowing the state to present that testimony. We further conclude that the Appellate Court properly determined that the admission of the photographs and the testimony regarding the ziplock bag of hair was harmless error. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "In 1995, as [the] coach of a youth ice hockey team, the defendant met seven year old B, whose older brother was a member of the team, and B's mother. The defendant befriended B's mother, who was having marital difficulties at the time, offering to drive her son to Greenwich for hockey practices and games. She welcomed the help and even let B, who was not a team member, tag along for the rides. During that time, the defendant expressed a special interest in B, encourag-

---

[8] The defendant also claimed that the state had engaged in prosecutorial impropriety during closing arguments and that his right to due process was violated by virtue of the trial court's failure to instruct the jury properly. See *State* v. *Jacobson,* supra, 87 Conn. App. 443. The Appellate Court rejected these claims; id., 456, 463; which are not the subject of this appeal.

ing him to play hockey, helping him with his schoolwork and letting him sleep at his home a few nights a week. They became so close that the defendant became B's godfather.

"Sometime later, the defendant registered B to play on a youth football team. It was [through that team] that the defendant met nine year old M, one of B's teammates, and M's mother, a divorcee. M saw the defendant about twice a week during the football season and once a week after the football season ended, and occasionally he stayed the night at the defendant's home, along with B. At the request of M's mother, the defendant helped M with his schoolwork and became, according to M's mother, part of her support system.

"In 1999, the defendant moved to Florida, but he maintained contact with both M and B. He purchased a [cellular telephone] for M and called him regularly for updates on his schoolwork. He checked on B a couple of times a week to find out how he was faring in school and with sports. He also returned periodically to Connecticut to visit them both.

"On one such visit, in 2001, the defendant stayed two nights at B's house, along with M. The defendant slept in the same bedroom as M, B and two of B's brothers. The beds were pushed together, and the defendant slept next to M. M testified that he awoke the first night and realized that the defendant was under the covers performing oral sex on him. Rather than confront the defendant, M pretended to be asleep. The next day, M accompanied the defendant and B to breakfast but decided not to mention what had occurred the night before. That night, M and the defendant again stayed at B's house, the sleeping arrangements being the same. According to M, he awoke in the night to find the defendant performing oral sex on him. He ejaculated in the defendant's mouth and cried himself to sleep.

"Shortly thereafter, M's mother had a falling out with her parents, with whom she and her two sons were living, and was asked to leave. After speaking with the defendant about the falling out, she and her two boys left for Florida and eventually moved into an apartment with the defendant. According to M's mother, she and the defendant initially got along quite well, but as time went on, she became increasingly concerned [about] his relationship with M, claiming that he spent an inordinate amount of time and money on M. As her relationship with the defendant soured, she asked him to leave the apartment, after which [M told her that the defendant had sexually assaulted him]. She immediately contacted the local police and arranged for M to return to Connecticut. Before returning to Connecticut herself, M's mother confronted the defendant with her son's allegation, to which he responded that M was lying.

"Back in Connecticut, M informed the Monroe police department that he had been sexually assaulted by the defendant at B's house in March, 2001. The police contacted B's mother, who was on vacation in Florida, and asked her to bring B to the police station when she returned to Connecticut. She flew back the next day, contacted the police department and was told that the defendant allegedly had sexually assaulted M. According to B's mother, she refused to believe the allegation. On the drive to the police station, she expressed to B her frustration with M and his mother, telling B that it was a waste of time to go to the police department. B responded: 'I know this happened to [M] because it happened to me, too.'

"According to B, while he was in the third grade [in 1997, the defendant sexually assaulted him] on three occasions. The first incident occurred when he slept at the defendant's home, in the same bed, and awoke to find the defendant touching his penis with his hands and mouth. B said nothing and eventually fell back

asleep. The second incident occurred a few weeks after the first incident. B again slept at the defendant's house, and before he fell asleep, the defendant forced B to touch the defendant's penis, after which he asked B to keep it secret. The third incident occurred a few months later, again at the defendant's house. That night, before B fell asleep, the defendant, who was naked, approached B, fondled his penis, giving him an erection, and attempted unsuccessfully to have B sodomize him." *State* v. *Jacobson,* supra, 87 Conn. App. 443–46. Additional facts will be set forth as necessary.

On appeal to the Appellate Court, the defendant raised several claims of evidentiary impropriety. Specifically, the defendant claimed that the trial court had abused its discretion in permitting the state to (1) present testimony about certain alleged prior misconduct by the defendant involving a third boy, (2) introduce into evidence fifty-nine photographs, almost all of which depicted young boys, that M's mother had found in the defendant's briefcase, and (3) adduce testimony about a ziplock bag of hair that M's mother also had found in the defendant's briefcase. With the exception of six of the photographs that depicted M and B, the Appellate Court agreed with the defendant that the trial court should not have permitted the state to present any of the challenged evidence. The Appellate Court also concluded, however, that the defendant was not entitled to a new trial because the improper admission of that evidence was harmless.

On appeal to this court upon our grant of certification, the defendant maintains that he is entitled to a new trial because, contrary to the determination of the Appellate Court, the trial court's evidentiary rulings constituted harmful error.[9] The state contends, first, that the Appel-

---

[9] With respect to the photographs, the defendant does not challenge the conclusion of the Appellate Court that the six photographs of M and B were admissible. Rather, the defendant's claim is limited to the fifty-three remaining photographs.

late Court improperly concluded that the trial court had abused its discretion in allowing the state to adduce testimony regarding the defendant's prior misconduct. Alternatively, the state maintains that, even if the Appellate Court correctly concluded that the trial court improperly had failed to exclude that prior misconduct evidence, the Appellate Court also correctly concluded that the admission of that testimony constituted harmless error. The state further maintains that the Appellate Court correctly concluded that the admission of the photographic evidence and the testimony concerning the bag of hair, although improper, was harmless.[10] We agree with the state that the Appellate Court incorrectly concluded that the trial court had abused its discretion in permitting the state to adduce testimony regarding the defendant's prior misconduct. We also conclude that the Appellate Court correctly determined that the state's use of the photographic evidence and testimony regarding the bag of hair does not entitle the defendant to a new trial because the admission of that evidence was harmless.

Before addressing the specific evidentiary issues presented by this appeal, we set forth certain general principles that govern our review of claims of evidentiary impropriety. "It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence . . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Furthermore, [i]n determining whether there has

---

[10] On appeal to this court, the state does not challenge the conclusion of the Appellate Court that the trial court abused its discretion in admitting the photographic evidence and testimony concerning the bag of hair. The state claims only that the Appellate Court correctly concluded that the admission of that evidence was harmless.

been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 723–24, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). "Despite this deferential standard, the trial court's discretion is not absolute." *State* v. *Cortes*, 276 Conn. 241, 254, 885 A.2d 153 (2005). Thus, "[i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). With these principles in mind, we turn to the defendant's claims.

I

The defendant first claims that, although the Appellate Court correctly concluded that the trial court had abused its discretion in allowing the state to adduce testimony about the defendant's alleged prior misconduct with a third young boy, the Appellate Court incorrectly concluded that the admission of that testimony was harmless. The state maintains that the testimony was admissible to prove the existence of a common plan or scheme to abuse young boys sexually. We agree with the state.

The following additional facts and procedural history are necessary to our resolution of this issue. "[T]he

state offered . . . [the] testimony [of K, the mother of another young boy with whom the defendant had developed a relationship] as prior misconduct evidence. She testified that she [had] met the defendant sometime in 1990 or 1991, when she was going through a difficult divorce. She introduced the defendant to her son, who was seven or eight years old at the time, and the two quickly became friends. The defendant suggested that her son take up ice hockey, but K informed him that she had neither the time nor the money for him to do so. The defendant offered to pay for her son's hockey expenses and to drive him to and from practices and games. K accepted the offer. On one occasion, when her son had a game on Friday night and another early Saturday morning, the defendant had him sleep at his house. One week later, K learned that her son had slept in the same bed with the defendant. Shortly thereafter, she decided to end the defendant's relationship with her son. She testified in relevant part: 'I started pulling back and pulling away because . . . my eyes were opened to what vulnerability I would be in with my divorce, and I didn't think it was a good situation, and I didn't think it was [a] good judgment call on [the defendant's] part.' " *State* v. *Jacobson*, supra, 87 Conn. App. 452. K did not allege, however, that the defendant ever sexually assaulted her son.[11]

The state also adduced testimony from Lisa Radigan, a licensed clinical social worker and former child abuse services coordinator for the Center for Women and Families in Bridgeport. Radigan testified, without objection, about the "grooming process" that frequently is used by sex offenders in connection with their seduction of children. According to Radigan, the grooming process generally consists of several stages: (1) seeking

---

[11] We note that the defendant did not request a jury instruction limiting the purpose for which evidence of the defendant's alleged prior misconduct could be considered, and the trial court did not give such an instruction.

out the child; (2) getting to know the child; (3) gaining the child's trust; and (4) engaging in inappropriate conduct with the child, not rising to the level of actual sexual abuse, for the purpose of ascertaining whether the child will report the inappropriate conduct to a parent. Radigan characterized the fourth step in the grooming process as "pushing the line . . . ." If the child does not report the inappropriate conduct, the sex offender is likely to conclude that the child also will not report any sexual abuse and, therefore, that it is safe to engage in such conduct. Radigan further testified that children who are isolated from their families or otherwise feel vulnerable are frequently targeted for sexual abuse.

On appeal to the Appellate Court, the defendant claimed that the trial court had abused its discretion in permitting the state to adduce K's testimony. The state maintained that K's testimony was admissible under § 4-5 (b) of the Connecticut Code of Evidence[12] as evidence of a common plan or scheme.[13] See *State v. Jacobson,* supra, 87 Conn. App. 453. The Appellate

---

[12] Section 4-5 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of other crimes, wrongs or acts inadmissible to prove character. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person.

"(b) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. . . ."

[13] At trial, the state maintained that K's testimony was admissible "to rebut [the defendant's] allegation that he was forced into a surrogate father role with the two victims . . . ." *State v. Jacobson,* supra, 87 Conn. App. 452. On appeal, however, the state claims only that K's testimony was admissible as evidence of a common plan or scheme. See *State v. Colon,* 272 Conn. 106, 187–88, 864 A.2d 666 (2004) (when trial court reaches correct decision but on mistaken grounds, this court will sustain trial court's action if proper grounds exist to support it), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Court concluded that the testimony was inadmissible to establish a common plan or scheme to assault young boys sexually. See id., 454. In particular, the Appellate Court concluded that the prior misconduct was not sufficiently similar to the charged conduct because the defendant never sexually assaulted K's son. Id.

We begin our review of the issue presented by noting that, "[a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citation omitted; internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 684, 800 A.2d 1160 (2002); see also Conn. Code Evid. § 4-5 (a). Under § 4-5 (b) of the Connecticut Code of Evidence, however, evidence of prior misconduct may be admitted when it is offered for a purpose other than to establish the defendant's bad character or criminal propensity. Among other things, prior misconduct evidence may be admissible to prove intent, identity, motive, malice or a common plan or scheme. Conn. Code Evid. § 4-5 (b). Thus, the fact "[t]hat evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976).

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . ." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 661, 835 A.2d 895 (2003).

"The first prong of the test requires the trial court to determine if an exception applies to the evidence sought

to be admitted." *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994). "When evidence of prior [uncharged] misconduct is offered to show a common plan or [scheme], the marks which the . . . [charged and uncharged misconduct] have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 355, 852 A.2d 676 (2004). "[T]he inference need not depend [on] one or more unique features common [to both the charged and uncharged misconduct], for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together." (Internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 791, 785 A.2d 573 (2001).

"To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan [when] the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) Id., 792. Our inquiry should focus on each of the three factors because no single factor is likely to be determinative. E.g., *State* v. *Romero*, 269 Conn. 481, 498, 849 A.2d 760 (2004). Furthermore, "[w]e are more liberal in admitting evidence of other criminal acts to show a common scheme or pattern in [trials of] sex related crimes than [in trials of] other crimes." (Internal quotation marks omitted.) *State* v. *George B.*, supra, 258 Conn. 792.

In applying these principles to the present case, the Appellate Court concluded that the trial court had abused its discretion in allowing the state to adduce K's testimony. *State* v. *Jacobson*, supra, 87 Conn. App. 454. The Appellate Court explained that, although K's

testimony was not too remote in time to the charged offenses and involved a male child who was similar in all material respects to M and B, the uncharged misconduct was not sufficiently similar to the charged misconduct to warrant its admission as evidence of a common plan or scheme. Id. Specifically, the Appellate Court stated that, "[a]lthough the defendant's relationship with K's son bore many similarities to his relationship[s] with M and B . . . there was a crucial difference: The defendant did not sexually abuse K's son. [Thus], it cannot be inferred logically that if the defendant was guilty of the uncharged misconduct, he also must have been guilty of the charged offenses involving M and B." Id.

In evaluating the conclusion of the Appellate Court, we first consider whether the uncharged misconduct was too remote in time to the charged misconduct. M testified that the defendant sexually assaulted him on two separate occasions in March, 2001, and B testified that the defendant sexually assaulted him in 1997, when he was in the third grade. According to K, she first met the defendant in either 1990 or 1991. K's testimony, therefore, related to events that occurred nearly ten years before the defendant's abuse of M and approximately six years prior to the defendant's abuse of B. In State v. Romero, supra, 269 Conn. 498, we upheld the admission of evidence of uncharged sexual misconduct that had occurred nine years prior to the charged sexual misconduct, and in State v. Kulmac, supra, 230 Conn. 62 n.14, we relied on case law from two other jurisdictions in which the appellate courts had upheld the admission of evidence of prior misconduct occurring ten years prior to the charged misconduct. See United States v. Hadley, 918 F.2d 848, 851 (9th Cir. 1990), cert. dismissed, 506 U.S. 19, 113 S. Ct. 486, 121 L. Ed. 2d 324 (1992); Adrian v. People, 770 P.2d 1243, 1245 (Colo. 1989). We acknowledge, nevertheless, that an interval of six to ten years is not an insignificant period of time,

and that "increased remoteness in time does reduce the probative value of prior misconduct evidence . . . ." *State* v. *Romero*, supra, 499–500. Even a relatively long hiatus between the charged and uncharged misconduct, however, is not, by itself, determinative of the admissibility of common plan or scheme evidence; see *State* v. *Kulmac*, supra, 62; especially when there are distinct parallels between the prior misconduct and the charged misconduct.

We turn, therefore, to the second factor, namely, whether the prior uncharged misconduct involved a person similar to the prosecuting witnesses. The defendant began spending time with M, B and K's son when each boy was approximately seven years old. Each child's mother was either divorced or experiencing significant marital difficulties, and the defendant befriended each of them. In addition, the defendant was linked to all three boys through sports; he provided both financial and emotional support to them, serving as their friend and mentor; he invited each of the boys to spend the night at his home; and he slept in the same bed with them. We agree with the Appellate Court, therefore, that the defendant's relationship with K's son bore many important similarities to his relationships with M and B.

Finally, we must consider the degree of similarity between the charged and uncharged misconduct. The state claims that, even though the defendant never sexually assaulted K's son, his conduct toward K's son bore sufficient similarities to the charged conduct to be admissible as evidence of a common plan or scheme. Specifically, the state contends that the jury reasonably could have inferred from the totality of the evidence that the defendant was grooming K's son for sexual abuse just as he had groomed M and B for such abuse. According to the state, although there was no indication that the defendant ever had sexually assaulted K's son,

K's testimony nevertheless was probative of the existence of a common plan or scheme to abuse M, B *and* K's son sexually because that testimony demonstrated that the defendant had engaged in the same grooming process for all three boys. We agree with the state.

With respect to M and B, the state adduced testimony that was sufficient to permit a jury reasonably to conclude that the defendant's treatment of those two boys comprised part of a common plan or scheme to commit child sexual abuse. The evidence indicated that the defendant had manifested an uncommon interest in both children and had spent a significant amount of time with them. The evidence further demonstrated that the defendant had established a close relationship with each child, had purchased gifts for them and was actively involved in their lives, thereby gaining their trust. The defendant also slept in the same bed with M and B, conduct that the jury reasonably could have found was both highly unusual and highly suspect. Finally, the jury reasonably could have concluded that the defendant had engaged in that conduct as part of a grooming process that culminated in his sexual abuse of both boys.

K's description of the defendant's conduct toward her son also was sufficient to permit the conclusion that that conduct fit the same pattern, that is, that the defendant was grooming K's son for sexual abuse. As with M and B, the defendant demonstrated a keen interest in K's son when he was only seven years old. The defendant also established a close relationship with K, who was in the middle of a contentious divorce. In addition, the defendant purchased gifts for K's son and spent considerable time with him, frequently in connection with K's son's athletic activities. Eventually, the defendant invited K's son to stay overnight with him at his home, at which time the defendant and K's son slept in the same bed. In light of Radigan's testimony about

the grooming process generally and the testimony of M and B about the treatment they had received from the defendant leading up to the sexual assaults that he committed against them, the jury reasonably could have concluded that the defendant was grooming K's son for sexual abuse, as he had with M and B. The defendant befriended K's son and, after gaining his trust and confidence, tested the limits of his tolerance for the defendant's inappropriate conduct by inviting him to his home and sleeping with him in the same bed. Although the defendant never sexually assaulted K's son, the jury could have concluded that the defendant did not do so only because K terminated the defendant's relationship with her son upon learning that the defendant had slept with him in the same bed. On the basis of this evidence, the jury reasonably could have determined that the defendant's treatment of K's son was part of a common plan or scheme to abuse young boys sexually and, therefore, that K's testimony about that treatment was admissible to show that common plan or scheme.

We therefore disagree with the Appellate Court that the trial court improperly allowed the state to adduce K's testimony merely because the defendant did not sexually assault K's son. This court previously has upheld the state's use of evidence implicating the accused in a common plan or scheme to commit sexual abuse even though the uncharged misconduct did not rise to the level of a sexual assault. For example, in *State* v. *George B.*, supra, 258 Conn. 782, the defendant, George B., was charged with having forcible sexual intercourse with his granddaughter, C. The trial court allowed the state to adduce testimony of another granddaughter, C's sister, J, that George B. had made sexual advances toward her. Id., 789–90. In concluding that the trial court had not abused its discretion in allowing the state to adduce J's testimony as evidence of a common plan or scheme even though George B.'s prior

conduct did not culminate in any sexual contact, we explained that the other "striking similarities between the prior conduct and the charged conduct were not diluted simply because" of the differences in the charged and uncharged misconduct. Id., 793. We concluded, instead, that the uncharged conduct was similar to "[George B.'s] conduct leading to intercourse with C" and, therefore, that the trial court reasonably had determined that J's testimony was admissible to demonstrate a common plan or scheme. Id., 792.

Similarly, in *State* v. *McKenzie-Adams*, 281 Conn. 486, 530–33, 915 A.2d 822 (2007), we concluded that the prior sexual misconduct of the defendant, Van Clifton McKenzie-Adams, although significantly different in degree from the charged conduct, nevertheless was admissible to prove a common plan or scheme. In that case, McKenzie-Adams, a high school teacher, was charged with multiple counts of sexual assault stemming from his sexual relationships with two female students, N.R. and P.L. Id., 490–96. After the trial court consolidated the cases of N.R. and P.L. for trial, the state adduced evidence that McKenzie-Adams initially had engaged in intimate personal conversations with both N.R. and P.L. in the school library; see id., 531; and later "began to embrace both victims more frequently, intimately and tightly when he encountered them in the [school] hallways . . . ." Id. Thereafter, the defendant engaged in sexual intercourse with N.R. and P.L. Id., 525. The state also presented the testimony of a third student, R.S., as evidence of a common plan or scheme. Id., 527–28. Specifically, R.S. testified that she and P.L. had had a conversation with McKenzie-Adams in the school library in which he told the two girls that, "since [they] were virgins [they] should have sex with someone around his age . . . because [men] are more experienced at his age." (Internal quotation marks omitted.) Id., 528. R.S. also testified that, on several occasions,

McKenzie-Adams had embraced her in a sexual manner when she encountered him in the hallways of the school. Id. In concluding that the trial court had not abused its discretion in permitting the state to adduce the testimony of R.S. for the purpose of establishing a common plan or scheme, we emphasized that McKenzie-Adams' "sexual misconduct with R.S. was similar to the initial stages of his sexual misconduct with both N.R. and P.L." Id., 531. We further concluded that, although McKenzie-Adams' misconduct had not progressed beyond the initial stages with R.S., "the jury reasonably could have inferred from [the] testimony [of R.S.] that his misconduct ceased only after she rebuffed his sexual advances and reported his behavior to her mother and brother. Accordingly . . . the fact that R.S. suffered less severe sexual misconduct than N.R. and P.L. [did] not illustrate a behavioral distinction of any significance." (Internal quotation marks omitted.) Id.; see also *State* v. *James G.*, 268 Conn. 382, 394, 401, 844 A.2d 810 (2004) (witness' common plan or scheme testimony admissible when defendant's early abuse of witness was similar to abuse of victim and could be viewed as grooming); cf. *State* v. *Kulmac*, supra, 230 Conn. 62–63.

We reach the same conclusion with respect to the admission of K's testimony about the defendant's interaction with her son. As we have explained, although the defendant never sexually assaulted K's son, K's description of the defendant's relationship with and actions toward her son—in particular, sleeping in the same bed with him at the defendant's home—was sufficient to permit an inference that the defendant was grooming K's son for the same kind of sexual abuse that the defendant later inflicted on M and B. In view of the liberal standard of admissibility that governs the use of prior misconduct evidence in sexual assault cases, and with due regard for the broad leeway that

a trial court possesses in determining the admissibility of such evidence, we cannot conclude that the trial court abused its discretion in allowing K to testify about the defendant's prior conduct with her son.[14]

We next must decide whether the probative value of K's testimony outweighed its prejudicial effect. The defendant claims that K's testimony had little probative value and that its prejudicial impact was substantial because it depicted him as a "man of twisted sexual desires . . . ." We do not agree.

We have stated that "relevant . . . evidence may be excluded by the trial court if the court determines that

[14] Our analysis and holding in *State* v. *Ellis*, supra, 270 Conn. 337, is not to the contrary. In *Ellis*, the defendant, Robert Ellis, a softball coach, was charged with multiple counts of sexual assault in connection with his sexual misconduct involving Sarah S., the younger sister of a softball player whom Ellis had coached. Id., 339–40, 346. The state adduced testimony from three other girls, Julia S., Kristin C. and Kaitlyn M., all of whom were players on Ellis' softball team, to establish that the defendant's sexual abuse of Sarah S. was part of a common plan or scheme to engage in such conduct. See id., 343, 349, 352. On appeal, we concluded that the trial court had abused its discretion in permitting the state to adduce that prior misconduct testimony because "Sarah S.'s relationship with [Ellis] differed in several important respects from his relationship with the other girls" and because "there were few similarities between [Ellis'] abuse of Sarah S. and his abuse of the other girls." Id., 358. Specifically, "Sarah S., unlike the other girls, was not a member of . . . [Ellis'] softball team, did not have frequent and continuous contact with [Ellis] as a player, did not take weekly private lessons with [Ellis] over a period of several years, did not develop a close personal relationship with [Ellis] and did not regard him as a confidant. Even more significantly, she did not feel compelled, as did the other girls, to cultivate or continue a relationship with [Ellis] following the abuse because of his ability to assist her in obtaining a college softball scholarship." Id., 361. Furthermore, Ellis' sexual misconduct with Sarah S. was significantly more frequent and severe than his sexual misconduct with the three other girls. Id., 360. In fact, although Ellis' "abuse of Julia S., Kristin C. and Kaitlyn M. bore some similarities, it had very little in common with his [frequent and severe] abuse of Sarah S." Id. In contrast to the victims in *Ellis*, M, B and K's son shared a similar relationship with the defendant, and the defendant's treatment of M and B was virtually identical to the defendant's conduct toward K's son before K terminated her son's relationship with the defendant. Consequently, *Ellis* does not support the defendant's contention that the trial court improperly admitted K's testimony.

the prejudicial effect of the evidence outweighs its probative value. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted. . . . [Accordingly] [t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003); see also Conn. Code Evid. § 4-3.

We reject the defendant's contention that the trial court improperly allowed the state to elicit the challenged testimony because its marginal relevance did not outweigh its substantial prejudicial effect. As we have explained, K's testimony was relevant to establish that the defendant had engaged in a common plan or scheme to abuse young boys sexually. Nevertheless, there was no evidence to indicate that the defendant ever sexually abused K's son, and K testified that the defendant and her son slept in the same bed together on only one occasion. Although we do not doubt that K's testimony was damaging to the defendant, we cannot say that that evidence was inflammatory or otherwise so prejudicial that the trial court lacked discretion to admit it.[15] Indeed, K's testimony was probably less likely to arouse unduly the jurors' emotions, hostility or sympathy when similar testimony, such as that of M and B regarding the defendant's conduct leading up to his sexual misconduct, already had been presented to the jurors. See, e.g., *State* v. *James G.*, supra, 268 Conn.

---

[15] The jury also had heard testimony indicating that, on at least one occasion, the defendant had slept in the same bed with B's younger brother.

400. In fact, to the extent that K's testimony tended to depict the defendant as harboring an inordinate and manifestly inappropriate interest in young boys, the testimony of M and B depicted that interest far more graphically. Accordingly, we reject the defendant's claim that he is entitled to a new trial because the trial court declined to disallow K's testimony.

## II

The defendant also contends that the admission of the photographs and the testimony about the ziplock bag of hair constituted harmful error. We also disagree with these claims.

The opinion of the Appellate Court sets forth the following additional facts that are necessary to our resolution of these issues. "[At trial, M's mother testified that] after M informed her that he had been sexually assaulted by the defendant, she began packing her things in order to return to Connecticut. In doing so, she came across the defendant's briefcase in a closet next to his bedroom, in which she discovered, among other things, fifty-nine photographs, primarily of young boys, including two of M and four of B. Although the boys in the photographs were not nude, a few were shirtless. The defendant [testified] that the photographs were, in large part, hockey memorabilia, pictures given to him by parents of hockey players whom he had coached throughout the years.

"Outside of the jury's presence, the state offered into evidence all fifty-nine photographs, arguing that '[i]t goes to the interest—the intent, the interest this defendant has in young boys.' The court ruled, over the defendant's objection, that all fifty-nine photographs were admissible. Its rationale was that 'all of the pictures involved, with the exception . . . of one [in which] there is a young girl . . . all of them are young boys. And it's going to show, keeping those pictures, his pro-

clivity or interests in young boys.' The court instructed the jury, however, that possession of the photographs was not criminal and that the jury was free to decide what weight, if any, to give the evidence." *State* v. *Jacobson*, supra, 87 Conn. App. 447–48.

"[T]he state [also] offered into evidence a ziplock bag of hair that M's mother . . . discovered, along with the photographs, in the defendant's briefcase. The court precluded the state from introducing the bag of hair into evidence on the ground that it could lead to speculation by the jury. Later, however, the state notified the court that it intended to question the defendant about the bag of hair on cross-examination. The court ruled, over the defendant's objection, that the state would be allowed to do so. When questioned about the hair, the defendant explained: '[T]he captain of my . . . team shaved his head before a tournament. His mother put the hair in a . . . manila envelope with a little certificate they made on a computer, and a letter from his mother explaining [that] this is official [team] hair.' " Id., 450.

As we have explained, the state does not challenge the determination of the Appellate Court that the admission of the fifty-three photographs depicting children other than M or B and the testimony about the bag of hair was improper. Rather, the state maintains that, as the Appellate Court concluded, the admission of the challenged evidence was harmless.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . As we have recently noted, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination that the defendant was harmed by the trial court's [evidentiary rulings] is guided by the various

factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Ritrovato*, 280 Conn. 36, 56–57, 905 A.2d 1079 (2006).

We agree with the state that the defendant has failed to satisfy his burden of demonstrating that the evidentiary improprieties were harmful. First, neither the photographs nor the defendant's testimony regarding the bag of hair was central to the state's case. For example, the state's questioning of the defendant about the bag of hair was relatively brief, comprising less than one full transcript page, and the bag of hair itself never was admitted into evidence. The defendant, moreover, proffered a reasonable, innocent explanation as to how he had come to possess the hair. Additionally, the testimony at trial established that the defendant had slept in the same bed with young boys, evidence that is far more probative of an inappropriate interest in children than the bag of hair which, according to the defendant, he had retained as a keepsake or memento.

With respect to the photographs, there was nothing salacious or provocative about any of them, and, consequently, there was no reasonable likelihood that they inflamed the passions of the jurors or otherwise swayed the jurors in favor of conviction. To the extent that the photographs tended to demonstrate that the defendant had an interest in young boys, other admissible—and uncontroverted—evidence amply established that

fact.[16] In addition, the defendant proffered a plausible explanation for his possession of those photographs, namely, that he had been given the photographs by parents of the children depicted in the photographs, and that explanation was confirmed by a defense witness.[17]

Furthermore, and importantly, the state's case against the defendant was quite strong. Although there was no physical evidence of the defendant's alleged sexual misconduct, the state adduced testimony from two separate victims, M and B, that the defendant had sexually assaulted them. Both M and B testified about the similar manner in which the defendant had befriended them, gained their trust and then probed the limits of their tolerance for his inappropriate behavior—a technique that, according to the state's expert, Radigan, is common to those who prey sexually upon children. Moreover, the record is devoid of evidence of any conspiracy or agreement between M and B to fabricate or to implicate the defendant falsely. Finally, the state's case was buttressed by the testimony of six constancy of accusation witnesses, who corroborated the complaints of M and B that the defendant had sexually assaulted them. See, e.g., *State* v. *Gonzalez*, 272 Conn. 515, 526, 864 A.2d 847 (2005) (constancy of accusation evidence admissible to corroborate victim's testimony).

We conclude, therefore, that the admission of the photographs and the testimony concerning the bag of

---

[16] Although the defendant denied that he harbored any improper or unusual interest in young boys, he never disputed the fact that he had taken a special interest in a number of such boys, including M, B and K's son, among others.

[17] Indeed, because the defendant does not challenge the admissibility of the six photographs of M and B that were found along with the fifty-three other photographs, it may be that the admission of the additional photographs actually served the defendant's interests. As the Appellate Court explained: "Without those [fifty-three] photographs, the jury would have been left with the impression that the defendant possessed photographs only of [M and B]. The additional photographs allowed the jury to infer that the six photographs of [M and B] held no special significance to the defendant." *State* v. *Jacobson*, supra, 87 Conn. App. 450.

hair was harmless. Consequently, we reject the defendant's claim that the state's use of that evidence entitles him to a new trial.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.