# STATE OF CONNECTICUT *v.* GEOVANNY ZILLO
## (AC 30998)

DiPentima, C. J., and Beach and Bear, Js.

Argued September 2—officially released November 2, 2010

*Timothy F. Sullivan,* for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Terence D. Mariani, Jr.,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Geovanny Zillo, appeals from the trial court's judgment of conviction, following a jury trial, of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), three counts of risk of injury to a child in violation of General Statutes § 53-21 (1) and one count of risk of injury to a child in violation of § 53-21 (2).[1] On appeal, the defendant claims that (1) the court erroneously admitted 2188 photographs into evidence and (2) he was denied his constitutional right

---

[1] We note that both the defendant and the state in setting forth the procedural history of this case state that the defendant was convicted of three counts of sexual assault in the first degree, one count of attempt to commit sexual assault in the first degree, two counts of risk of injury to a child pursuant to § 53-21 (1) and one count of risk of injury to a child pursuant to § 53-21 (2). The defendant's appeal form also contains a similar error. In the interest of justice, we assume this is nothing more than a scrivener's error. The record clearly reflects that the defendant was convicted of three counts of risk of injury to a child pursuant to § 53-21 (1) in addition to the conviction of the other listed charges.

to a fair trial on the basis of prosecutorial impropriety. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, are relevant to our resolution of the issues on appeal. The family of the eleven year old victim in this case,[2] all of whom emigrated to the United States from China, owned a Chinese restaurant that the defendant frequented during 1998 and early 1999.[3] During this time, the defendant became friendly with the victim and her family, often assisting the children with their homework and with the English language. The defendant was invited to family gatherings and holiday celebrations, and he purchased several gifts for the family, including a computer for the children and a $500 translator. The victim's parents eventually became concerned about the attention that the defendant was showing the victim, especially his attempts to speak with her privately, and the family told the defendant that he no longer was welcome at the restaurant. Accordingly, the defendant stopped going to the restaurant.

After the defendant stopped going to the restaurant, he began to follow the victim and to pick her up as she waited for the bus to take her to school. The defendant would take the victim to a house where he would sexually assault her. He also took her to a wooded area to take photographs of her, and he took her to a McDonald's restaurant. The victim testified that the defendant, whom she called G-Bunny, repeatedly sexually assaulted her when she was eleven years old. The defendant made the victim remove her clothing, kissed her breasts, performed oral sex on her, digitally penetrated

---

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] The family included the female victim, her mother, her father, her older sister and her younger brother.

her vagina and her anus, licked her anus, made her hold his erect penis in her hand, made her urinate into his mouth so that he could taste her urine to see if it was as "sweet" as she and attempted to make her perform oral sex on him. The defendant instructed the victim not to tell anyone about his behavior, and he told her that he wanted to marry her. He also gave her money.

In 2005 or 2006, the defendant established an account on the social website Myspace.com (MySpace) using the name AnnaLuckyOne, where he purported to be an Asian female and included a photograph of an unknown Asian female on his profile. He soon contacted the victim, who also had a MySpace account, and he attempted to establish a relationship with the victim by telling her that he was a young Asian girl. The defendant, acting as this young Asian girl, subsequently told the victim that the defendant was AnnaLuckyOne's friend and asked if she would be willing to resume a friendship with him. Suspicious that her new friend really was the defendant and not another young Asian female, the victim panicked and went to see her school counselor and her dormitory parent in whom she confided that the defendant previously had sexually assaulted her. Soon thereafter, the victim filed a police report, and a warrant was issued for the defendant's arrest. The defendant was tried on eight counts as set forth earlier in this opinion; he elected to be tried by a jury.

The jury found the defendant guilty on all eight counts as charged. The court accepted the jury's verdict and sentenced the defendant to a total effective term of thirty years imprisonment, execution suspended after fifteen years, with fifteen years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion in limine and permitted the state to

introduce into evidence 2188 photographs of adult Asian women that the police had found on an external hard drive, which was confiscated from the defendant's automobile pursuant to a search warrant. He argues that all of these photographs, with the exception of three photographs of one woman who was unclothed,[4] were innocuous photographs of fully clothed adult women of Asian descent. He further argues that these photographs were irrelevant to the charges that he faced, charges that involved an eleven or twelve year old child, that the photographs were obtained in 2006, some eight years after the crimes alleged, and that the introduction of these photographs to the jury was highly prejudicial. He argues that the jury could have concluded that "because the defendant possessed these [photographs] in 2006, he ha[d] a proclivity to Asian women and, because of that proclivity, he committed the charged offenses [eight] years earlier against a child who happened to be Chinese." In response, the state argues that "the trial court did not abuse its broad discretion in concluding that these photographs were admissible because they tend[ed] to establish the fact of the defendant's obsession with Asian females, and also in concluding that evidence of this obsession, in turn, tended to corroborate the testimony of the victim, as well as other witnesses, regarding the defendant's fixation with the eleven to twelve year old Asian victim. . . . The jury reasonably could have viewed such evidence, when considered in conjunction with all the other evidence, as tending to corroborate the victim's testimony that the defendant did, in fact, eventually

---

[4] The three photographs of the unclothed Asian female contain an image of a young Asian female who may or may not be of majority age. The court, however, found that because there was no evidence to indicate that the female in these photographs was not of majority age, this did not constitute uncharged misconduct on the part of the defendant. Neither the state nor the defendant contests this finding, nor does the defendant allege that the female in these photographs was a child.

engage in the prohibited sexual, and other, acts with the child." Although we agree with the defendant that the court abused its discretion in admitting the 2188 photographs into evidence, we conclude that the defendant has failed to show that the improper admission was harmful in that it substantially affected the jury's verdict.

Initially, we set forth the applicable standard of review. "Our analysis of the [defendant's] . . . [claim] is based on well established principles of law. The trial court's ruling on the admissibility of evidence is entitled to great deference . . . [and] will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Martinez*, 295 Conn. 758, 769–70, 991 A.2d 1086 (2010). "Despite this deferential standard, the trial court's discretion is not absolute. . . . Thus, [i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citation omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 627, 930 A.2d 628 (2007).

The following additional facts are relevant to our resolution of the defendant's claim. The defendant filed a motion in limine to preclude, inter alia, the state from offering into evidence 2188 photographs of adult Asian women that the police had obtained from his external hard drive.[5] Three of these photographs contained an

---

[5] None of the 2188 photographs were identified as containing an image of the victim.

image of one unidentified Asian female, who was unclothed.[6] The remaining 2185 photographs were facial images of unidentified adult Asian women, all of whom appeared to be fully clothed.[7] Additionally, there was no evidence as to when the defendant had downloaded these images, only that the police had obtained them in 2006, eight years after the defendant had last had physical contact with the victim. The state objected to the defendant's motion, arguing that the photographs were relevant to show that the defendant had a sexual interest in Asian females. The court agreed with this argument and further found that the potential prejudice from the admission of these photographs was minimal. We conclude that the court abused its discretion in admitting the photographs. We further conclude, however, that the defendant has failed to demonstrate that the improper admission was harmful error.

Section 4-1 of the Connecticut Code of Evidence provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." As it is used in our code, relevance encompasses two distinct concepts, namely, probative value and materiality. Conn. Code Evid. § 4-1, commentary; *State* v. *Jeffrey*, 220 Conn. 698, 709, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992). "Conceptually, relevance addresses whether the evidence makes the existence of a fact material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . In contrast, materiality turns upon what is at *issue* in the case, which generally will be determined by the

---

[6] See footnote 4 of this opinion.

[7] The ages of the females who appear in these photographs do not appear in the record. Neither the state nor the defendant contests the court's finding that all of the females were adults.

pleadings and the applicable substantive law. . . . If evidence is relevant and material, then it may be admissible." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gombert*, 80 Conn. App. 477, 488–89, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004); see Conn. Code Evid. § 4-1, commentary.

"When determining admissibility, however, relevance and materiality are not the only factors. Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Internal quotation marks omitted.) *State* v. *Gombert*, supra, 80 Conn. App. 489, citing Conn. Code Evid. § 4-3.

In our decision in *State* v. *Jacobson*, 87 Conn. App. 440, 449, 866 A.2d 678 (2005), aff'd, 283 Conn. 618, 627, 930 A.2d 628 (2007), we determined that the trial court abused its discretion in admitting into evidence fifty-three photographs of young boys, some containing images of boys without shirts, because the photographs were not relevant or material to the issues concerning the defendant's alleged sexual assault of male children. We explained that the photographs "did not have any direct connection with the crimes charged . . . nor were they sexually explicit . . . [and, therefore] that it was improper for the court to [have] admit[ted] those photographs into evidence." (Citations omitted; internal quotation marks omitted.) Id.

Similarly, in examining the 2188 photographs in evidence in the present case, we conclude that they did not have a tendency to make the existence of a fact that was material to the determination of the defendant's guilt of any of the offenses with which he was charged more probable or less probable than it would

have been without the photographs and that, therefore, they were not relevant to the proceeding. See id.; Conn. Code Evid. § 4-1. The photographs had no connection to the offenses charged. Having even what might be considered an obsession with adult Asian women[8] simply does not lead one to any reasonable conclusion that such a person would have a sexual attraction to a specific female Asian child of eleven or twelve years of age. It is not contested that these photographs contained images of adult Asian women, not female Asian children,[9] and all but three of the photographs contained images of women appearing to be fully clothed. Furthermore, the photographs were seized by the police in 2006, and there was no evidence as to when the defendant had obtained them. We can ascertain no relevant connection between 2185 photographs of fully clothed adult women, in nonsexual circumstances, and the commission of sexual crimes against an eleven year old female child, even if the subjects of all of the photographs and the child victim were of Asian descent.[10] Accordingly, we conclude that the court abused its discretion in admitting the photographs into evidence.

Our inquiry, however, does not end here. Because the admission of the photographs raises an evidentiary, rather than a constitutional issue, the defendant must demonstrate that the court's improper ruling was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . As we have . . . noted, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur

---

[8] See footnote 7 of this opinion.

[9] We do not mean to imply that had these photographs contained images of Asian children they would have been admissible.

[10] We also cannot ascertain any relevance between the three photographs of an unclothed Asian woman and the repeated sexual assault of a female child of Asian descent.

determination that the defendant was harmed by the trial court's [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Jacobson,* supra, 283 Conn. 641–42.

In *Jacobson,* our Supreme Court agreed with our conclusion that the improper admission of fifty-three photographs of young boys was harmless in that it was unlikely that it affected the jury's verdict. Id., 642–44; *State* v. *Jacobson,* supra, 87 Conn. App. 450. The court explained that although the photographs may have tended to demonstrate that the defendant had an interest in young boys, other evidence also demonstrated that fact. *State* v. *Jacobson,* supra, 283 Conn. 642. It further explained that the case against the defendant had been strong, the boys that he was accused of assaulting sexually had testified at trial and several constancy witnesses also had testified. Id., 643. Taken together, these facts supported our conclusion that the admission of the photographs was harmless in that there was no indication that it substantially affected the jury's verdict. Id., 643–44.

In the present case, even if we were to agree with the defendant's argument that the admission of the photographs, although only tending to demonstrate that the defendant had an interest in adult Asian women, might persuade the jury that he also had an interest in female Asian children, we, nevertheless, conclude that the

admission of the evidence was harmless in that it was unlikely that it had any substantial effect on the jury's verdict. The evidence in this case against the defendant was strong. Witnesses testified that the defendant had an unusual preoccupation with the specific child victim in this case and that he repeatedly found ways to be alone with her. The victim testified about the repeated sexual assaults committed by the defendant when she was a child. She also testified as to why she finally came forward with her allegations; she explained that the defendant had established a MySpace Internet account under the guise that he was a young Asian girl, and that many years after the assaults in question, he had contacted her, pretending to be this Asian girl in an attempt to see if she would agree to resume a friendship with him. She and others testified about the trauma that the defendant's assaults had had on her throughout her young life, how she tried to keep them a secret because she believed that her family would be dishonored and she would be disowned, and how traumatic it was when the victim discovered that the young Asian immigrant girl with whom she was chatting on the Internet really was the defendant, who was attempting to reestablish a relationship with her.

We conclude, therefore, that the defendant has failed to demonstrate that the court's improper admission of the photographic evidence was harmful in such a way as to substantially affect the jury's verdict.

II

The defendant next claims that "the prosecutor's comments during closing argument were improper and thus deprived the defendant of a fair trial." He argues that "[t]he prosecutor made numerous statements to the jury during the state's closing argument that amounted to prosecutorial [impropriety] because the prosecutor vouched for the credibility of one of the

state's key witnesses; his statements appealed to and inflamed the jury's emotions; and, his comments distracted the jurors from making their own independent judgment based on the evidence properly before the court." We are not persuaded that the prosecutor's comments were improper.

Initially, we set forth the applicable principles regarding claims of prosecutorial impropriety. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"Prosecutorial impropriety can occur during both the cross-examination of witnesses and in the course of closing or rebuttal argument. . . . In the event that such impropriety does occur, it warrants the remedy of a new trial only when the defendant can show that the impropriety was so egregious that it served to deny him his constitutional right to a fair trial. . . . To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial

[impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 36–37, 975 A.2d 660 (2009). With these principles in mind, we now turn to the allegedly improper statements made by the prosecutor during closing and rebuttal argument.

The defendant claims that he was deprived of a fair trial due to the improper remarks of the prosecutor made during closing and rebuttal argument. Specifically, he argues that the prosecutor attempted to demonstrate to the jury that he believed the victim, especially by his repeated use of the words "I think." He further argues that although the court added an instruction to the jury on improper vouching, the additional language was insufficient to cure the effect of the alleged impropriety. We are not persuaded.

The following additional facts are relevant to this issue. During the state's closing argument, the defendant objected to some of the prosecutor's argument, alleging that he was attempting to vouch for the victim's credibility. The court stated that it would give an appropriate instruction to the jury on the issue. At the conclusion of closing arguments, out of the presence of the jury, the court and counsel for both the state and the defendant had an exchange as to whether an instruction on vouching was necessary and, if so, what it should entail. Although the court stated that it did not find that the state improperly had vouched for the victim, it was willing to give an instruction to the jury on the issue during its final charge, and it proposed the following language: "No attorney may personally vouch for the credibility of any witness. An attorney may argue, however, ways—argue why you should find a witness' testimony truthful. To the extent you believe that an attorney has personally vouched for the credibility of

any witness, you should disregard it." The prosecutor stated that he did not agree that the additional language was necessary, but he also agreed that the statement was correct in law. The defendant specifically asked the court to add the additional language to its final jury instructions, which it did.

"We consistently have held that it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, supra, 293 Conn. 38. "The prosecutor, however, is not barred from commenting on the evidence presented at trial or urging the jury to draw reasonable inferences from the evidence that support the state's theory of the case, including the defendant's guilt. . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) Id., 38–39.

The defendant likens the prosecutor's use of the words "I think" in this case to the use of those same words in *State* v. *Gibson*, 114 Conn. App. 295, 309, 969 A.2d 784, cert. granted, 292 Conn. 916, 973 A.2d 1276 (2009), in which we found such use to be improper. In *Gibson*, the prosecutor had asked rhetorical questions of the jury and then answered those questions by making such statements as, "I think he did." Id., 305. We concluded that such statements were expressions of personal opinion and were improper. Id., 309. The present case, however, is inapposite to *Gibson*.

Here, the prosecutor's use of the words "I think" was consistently tied to the evidence or the reasonable inferences that could be drawn therefrom; the prosecutor argued such things as "I think the evidence is" or "I think the evidence shows . . . ." In this case, the use of the words "I think" was similar to the use of the words "I submit" and was not improper. As our Supreme Court has explained: "Although prosecutors generally should try to avoid using phrases that begin with the pronoun I, such as I think or I believe, we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. . . . Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 436, 902 A.2d 636 (2006). We conclude in this case that the prosecutor's use of the words "I think" was not improper.

The defendant also argues that the prosecutor improperly testified to the jury when he argued during rebuttal that "the defendant [was] sitting at a computer

screen pretending to be somebody else, not for one chat. The only one that was put into evidence was from February 6, 2006." The state argues that the prosecutor was asking the jury to make a reasonable inference, on the basis of the evidence, that there had been more than one communication between the defendant, posing as AnnaLuckyOne, and the victim in this case. We agree with the state. The February 6, 2006 chat clearly evinced prior chats between the defendant and the victim. As such, this comment was not improper.

The defendant also argues that the prosecutor's rhetorical questions to the jury were improper. He cites the following questions that were posed by the prosecutor during various parts of his closing and rebuttal arguments: "Why would she say that? Why would you make that up? . . . [Y]ou can't come to any other conclusion but that he's guilty. . . . Why would she risk bringing that shame on her parents if it wasn't true? . . . [W]hy would you risk that if what you were saying wasn't true? . . . Why else would she come in and say it if it wasn't true? . . . If she's not telling the truth, then what's the explanation for it?" (Internal quotation marks omitted.) We conclude that these comments were not improper.

Our Supreme Court "clearly has established the propriety of a prosecutor's comments on [the motives of a witness to lie], as long as the remarks are based on the 'ascertainable motives of the witnesses rather than the prosecutor's personal opinion.' . . . *State* v. *Fauci*, [282 Conn. 23, 37, 917 A.2d 978 (2007)]; see also *State* v. *Warholic*, [278 Conn. 354, 365, 897 A.2d 569 (2006)] ('the state may argue that a witness has no motive to lie'); *State* v. *Bermudez*, 274 Conn. 581, 593, 876 A.2d 1162 (2005) (prosecutor properly argued that witness 'had nothing to gain by testifying falsely'); *State* v. *Ancona*, 270 Conn. 568, 607, 854 A.2d 718 (2004) ('[i]t is permissible for a prosecutor to explain that a witness

either has or does not have a motive to lie'), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *Burton*, 258 Conn. 153, 170, 778 A.2d 955 (2001) ('the state may properly argue that the witnesses had no apparent motive to lie')." *State* v. *Long*, supra, 293 Conn. 45.[11]

The comments made by the prosecutor in the present case simply asked the jury to use its common sense to draw reasonable inferences from the facts of the case to ascertain whether the victim had a motive to lie. Such comments repeatedly have been deemed proper by our Supreme Court. See, e.g., id.; *State* v. *Fauci*, supra, 282 Conn. 37; *State* v. *Warholic*, supra, 278 Conn. 365; *State* v. *Bermudez*, supra, 274 Conn. 593; *State* v. *Ancona*, supra, 270 Conn. 607; *State* v. *Burton*, supra, 258 Conn. 170. Accordingly, we conclude that the use of such comments in this case was not improper.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[11] In *State* v. *Long*, supra, 293 Conn. 31, the prosecutor made, inter alia, the following statements to the jury: "You still haven't heard the motive. If you are going to make something up, why not just say he went all the way to sexual intercourse? He made me perform oral sex on him. He made me do this, he made me do that, he made me do this. It wasn't there. She explained the three different types of violations that were done to her by [the defendant]. And she stayed with that and gave you the details of that. If you are going to lie, why not just keep on lying and lying and lying? We didn't hear that." (Internal quotation marks omitted.) Id., 46. In his rebuttal, the prosecutor in *Long* also asked the jurors: "[I]n your own mind[s], do you think [that the victim is] clever enough to fabricate, to come up with details to fool everybody throughout the system? . . . Is she going to put herself through [an embarrassing physical examination]? For what?" (Internal quotation marks omitted.) Id., 47. At the close of rebuttal argument, the prosecutor argued: "To subject herself to the physical exam[ination], the discussions with her mother, the discussions with the family, surely, other people that she does not know, to put herself through that, for what benefit? I haven't heard of that. You have to ask yoursel[ves], is that because what she was telling was true?" (Internal quotation marks omitted.) Id. All of these comments were deemed proper argument by our Supreme Court. Id., 47–48.